IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　Respondent,<br><br>　　v.<br><br>C.J.C.,<br><br>　　　　　　Appellant. | No. 86438-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Following an arrest for the sale of drugs, 13-year-old C.J.C. entered into a deferred disposition. During his deferred disposition, C.J.C.'s probation officer requested a revocation hearing reporting several alleged violations of the conditions of his community supervision. At the conclusion of the hearing, the court revoked C.J.C.'s deferred disposition and sentenced him to 15 to 36 weeks in juvenile rehabilitation. In doing so, the court failed to indicate the evidence upon which it relied in its decision that the conditions of the deferred disposition had been breached. Because the judicial officer has since retired, we reverse, remand and direct the court to conduct a new hearing.

FACTS

In June 2023, 13-year-old C.J.C. was arrested for a drug offense in downtown Seattle. The State charged C.J.C. with violating the Uniform Controlled Substances Act by delivering fentanyl, a controlled substance and narcotic drug. On December 7, C.J.C.

entered a stipulated deferred disposition. A statement by C.J.C. in the deferral relating to the standard range sentence states:

> I understand if I do not comply with any of the terms of my community supervision, the court will revoke the deferred disposition and shall enter an Order of Disposition, after which the court may impose any sentence authorized by law, including the following:
>
> - 15 to 36 week commitment to JJ&RA for the following offenses:
>
>   -Delivery of Narcotic Drug or Methamphetamine

During the hearing, C.J.C. confirmed that he understood the stipulations in his statement for deferral. As stipulated, the court placed C.J.C. on 12 months of community supervision. The court's conditions of community supervision included:

> • Shall live in housing approved by his/her parent or guardian or in placement authorized by Department of Social and Health Services or the court and shall keep the [Juvenile Probation Counselor] informed of any change of address or placement. The respondent shall have parent/guardian's permission regarding whereabouts, hours, and activities. If the respondent is in DSHS placement, respondent shall comply with placement requirements.
>
> • Shall obey all criminal laws.
>
> • Shall not use, possess, or consume alcohol or any controlled substance except by doctor's prescription.

The court's order also required C.J.C. to be released to Washington State's Department of Children, Youth, and Families (DCYF). DCYF authorized C.J.C. to reside with his aunt, which the court agreed to, requiring him to follow all of his aunt's home rules, conditions of probation, and recommendations from his probation counselor. The stipulated statement of deferral was signed by C.J.C., his attorney, and the prosecutor.

Three weeks after the court approved the deferred disposition, C.J.C.'s probation counselor emailed the court requesting a "revoke or warrant" hearing. C.J.C. did not

appear at the hearing. The court stayed the issuance of a warrant for 48 hours to give him a chance to make contact with the probation counselor.

At the next hearing on January 4, C.J.C. was present. His aunt also appeared at the hearing. The probation counselor withdrew the request to revoke. The court granted C.J.C.'s release and placement with his aunt. The court also informed C.J.C. that his deferred disposition carries a "JRA sentence"[1] if he fails to comply with the terms of probation and it is revoked.

In February, after C.J.C. was placed on a 72-hour psychiatric hold at Seattle Children's Hospital, his probation counselor emailed court administration, on a Friday, requesting a "[r]evocation hearing" for "violations" as soon as possible because of the incident that resulted in C.J.C.'s hospitalization. The prosecutor, and C.J.C.'s attorney were copied on the email. The court replied to all, the following Monday, providing a February 8 date for a hearing if it worked for all parties. On February 7, the probation counselor submitted a Motion to Revoke/Modification of Deferred Disposition. The motion, titled "MOTION TO REVOKE/MODIFICATION OF DEFERRED DISPOSITION," states

> 1.1 The State moves to modify the Order of Deferred Disposition of the juvenile in the above-captioned case pursuant to chap. 13.40 RCW (Laws of 1994, ch. 7, section 545, 1st Sp. Sess.).
>
> 1.3 Based on the declaration(s) of Juvenile Probation Counselor, Diane Rayburn, submitted herewith, the juvenile has violated the terms and conditions of the Order of Deferred Disposition, as follows:
>
> Drug/Alcohol: The respondent tested positive for THC on 1/17/24 and reportedly used alcohol and Fentanyl on 2/1/24.

---

[1] The parties had stipulated in the deferred disposition that a revocation carried with it a potential 15-to-36-week commitment at a Juvenile Rehabilitation Administration facility, minus 94 days credit for pre-disposition detention.

> Juvenile Probation Counselor approved residence: The respondent left placement on 2/3/24 and whereabouts are still unknown.

The motion was supported by a declaration from the probation counselor. The counselor summarized the circumstances of the past few days based on reports from C.J.C.'s aunt, the Redmond Police Department and a caseworker from Child Protective Services (CPS). The probation counselor summarized that C.J.C. had skipped school on February 1 and did not come home until 10 p.m., and when he did, he appeared intoxicated and was with another teenager who had been threatening the aunt's teenage son. Police were called and said they could not do anything about C.J.C. being intoxicated. Police told C.J.C. and his friend to leave the premises. C.J.C. returned around midnight banging on his aunt's door begging to be let in. The police were called again and took C.J.C. to Seattle Children's Hospital Psych Ward on a 72-hour hold because his hands were cut up from banging on the door. The hospital called CPS to pick up C.J.C. CPS took C.J.C. to Ryther Bridges Lake Burien Cottage at 1 a.m. on February 3. C.J.C. slept until 1 p.m. and then ran away. His aunt reported that C.J.C. returned to her home on February 5 at 11 p.m. banging on her door. She told him that he needed to return to the cottage, but he refused, continuing to bang on her door. Police were called again and tried to return C.J.C. to his aunt, but she explained she could not allow him to return. He was found asleep in the laundry room and told he needed to return to DCYF placement at the cottage. The probation officer also wrote that C.J.C.'s whereabouts were currently unknown.

At the February 8 hearing, C.J.C. failed to appear and the court issued a bench warrant. C.J.C. turned himself in on the warrant on February 14. He appeared in custody at a warrant return hearing the next day. C.J.C. was represented at the hearing.

4

Also, in attendance were his aunt, his father, the probation counselor, the supervisor for DCYF's Office of Indian Child Welfare,[2] and an attorney representing the Tlingit-Haida tribe.

The State explained that C.J.C. had previously failed to appear for a motion to revoke his deferred disposition, and that the State and Probation were still seeking revocation. The State informed the court that the probation counselor provided the court with information regarding his violations of failing to stay in residential placement and using non-prescription drugs. The court then gave defense counsel an opportunity to respond.

Counsel requested the court not revoke and, instead, place C.J.C. back with his aunt while also on electronic home monitoring (EHM). Counsel represented that both C.J.C. and his aunt requested this option. Counsel explained the challenging circumstances C.J.C. has faced throughout his life, including that it is unclear who his legal guardian is. Counsel also informed the court that C.J.C. suffers from fetal alcohol syndrome, which has created challenges for him and those who have supported him. He argued that the court consider that C.J.C. is a unique individual before deciding to revoke, and instead release him, setting another review hearing to follow-up on his progress. At no time did C.J.C. or his counsel object to the revocation hearing proceeding or ask for a continuance.

The court next asked to hear from the Indian Child Welfare Social Service Specialist who said:

> I think that sometimes there's some of our youth that are in the minority that the only way that we're able to get the services delivered to them is in residence. And that's -- I believe [C.J.C.] is in that unique situation

---

[2] The record indicates that C.J.C. is an Indian Child and Tlingit-Haida is his tribe.

because of his fetal alcohol syndrome, the genetic card that he was dealt … that he's not at fault for. … And given how he's not seemingly able to comply voluntarily, I really do believe that he needs a greater intervention to get S&E services and to help protect him and his safety, given his age.

The court asked the probation counselor if the list of interventions and services listed on the second page of her revocation report were "things that have been tried that didn't work?" The probation counselor confirmed that they were. The probation officer said that C.J.C.'s aunt was willing to revisit having C.J.C. live with her if he were to go to juvenile rehabilitation and get the services he needs. The probation officer also relayed that the aunt had found fentanyl in a container when C.J.C. "ran." The representative for the tribe did not take a position regarding revocation.

C.J.C.'s aunt clarified her position regarding revocation:

So I've been in constant contact with [the probation counselor] and [DCYF] throughout the months and however many weeks that I've had [C.J.C.]. And he's stayed home. He has followed rules. But there was an incident that happened where I did not let him back in the house, and then he came home, missed court. But I just feel like the last couple weeks that I've had him, I think that he might need a little bit more than I can give him, which doesn't mean that I'm withdrawing from guardianship or I don't want him. I do want him, but I do feel like if he did do the JR or whatever the services are they're recommending, and then he was to come home after that, I feel like we would be in a better place … for him to be successful.

The aunt explained that she did think that EHM would be an option, but that she supported the probation counselor's and DCYF's recommendation. The aunt said, C.J.C. "definitely needs more treatment than I can, obviously, provide." The father spoke and also agreed with the probation counselor about the revocation.

The trial court then addressed the parties explaining that it looked at the history of the case in the court's docket system.

[T]he first thing I looked at was from April of last year, and I know it's been before that, but there was an FTA[3] on April 9th. He was arrested. He was released on EHM. Then he FTA'd again after breaking EHM.[4] He pled guilty and left placement. He violated in February of this year.

The court continued,

What I see also is the attempted interventions and services including DCYF placement in Tacoma shelter, JMC, a youth line referral, an FFT referral, Redmond High School, DCYF using Cowlitz Behavioral Health for a mental health referral, Seattle Children's Hospital Psych Ward, and placement with [C.J.C.'s aunt]. I have little confidence that EHM will work again this time. … I have no feeling of confidence that anything will work short of services basically being at him in a place that he can't do anything but obtain services.

The court gave C.J.C. an opportunity to speak. C.J.C. asked to "get on house arrest and go back to my auntie's house." C.J.C. also claimed he had never previously been placed on EHM. Nobody responded to his claim. The trial court then granted the motion to revoke. In the court's written order, the court found that C.J.C. failed to comply with the terms of his deferred disposition in two ways: (1) using or possessing non-prescribed drugs or alcohol; and (2) failing to reside in housing approved by his/her parent or guardian or in placement authorized by Department of Social and Health Services or the court and/or to inform the probation counselor of a change of address or placement. The court did not issue any written findings and, instead, incorporated its oral findings and conclusions.

---

[3] Failure to appear.

[4] According to the court, C.J.C. was previously placed on EHM and violated that condition, but C.J.C. was not arrested until June 30, 2023, with his deferred disposition not entered until December 7, 2023. C.J.C.'s trial attorney never contested said court's factual assertions, but during oral arguments, both parties concede that the court's observations related to EHM were factually inaccurate. Wash. Court of Appeals oral argument, State v. C.J.C., No. 86438-6 (Feb. 28, 2025), at 7 min., 40 sec. and 19 min., 6 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org/video/division-1-court-of-appeals-2025021524/?eventID=2025021524.

C.J.C appeals.

## DISCUSSION

Due Process

C.J.C. asserts that the court's order revoking his deferred disposition is insufficient to meet due process guarantees because the order does not provide any information about the evidence it considered or how that evidence supported revocation. We agree. Although C.J.C. raises other assignments of error, this question is dispositive.

Due process requires that an individual receive "adequate notice of the deprivation [of a protected interest] and a meaningful opportunity to be heard." State v. Beaver, 184 Wn.2d 321, 336, 358 P.3d 385 (2015).

RCW 13.40.127(6) provides, in relevant part,

The state shall bear the burden to prove, by a preponderance of the evidence, that the juvenile has failed to comply with the terms of community supervision.

RCW 13.40.127(7) provides,

(a) Anytime prior to the conclusion of the period of supervision, the prosecutor or the juvenile's juvenile court community supervision counselor may file a motion with the court requesting the court revoke the deferred disposition based on the juvenile's lack of compliance or treat the juvenile's lack of compliance as a violation pursuant to RCW 13.40.200.

(b) If the court finds the juvenile failed to comply with the terms of the deferred disposition, the court may:

(i) Revoke the deferred disposition and enter an order of disposition; or

(ii) Impose sanctions for the violation pursuant to RCW 13.40.200.

"So long as a revocation proceeding comports with the minimum requirements of due process, and revocation is based on evidence sufficient to reasonably satisfy the

court that probation conditions have been breached, an appellate court will not find an abuse of discretion." State v. Murray, 28 Wn. App. 897, 900, 627 P.2d 115 (1981) (citing State v. Drake, 16 Wn. App. 559, 563, 558 P.2d 828 (1976).

A "written statement by the factfinders as to the evidence relied on and reasons for revoking (probation or) parole" is one of the minimum requirements of due process. Gagnon v. Scarpelli, 411 U.S. 778, 786, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973); Morrissey v. Brewer, 408 U.S. 471, 489 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). However, a court's failure to make written findings for revoking probation does not deny a probationer due process where the court's oral opinion is contained in the record and indicates the evidence relied upon, as well as the reasons for revocation. Murray, 28 Wn. App. at 900-01 (citing State v. Myers, 86 Wn.2d 419, 429, 545 P.2d 538 (1976)).

Here, the trial court never made any written findings. It did not indicate orally or in its written order what evidence it relied on to support its finding that C.J.C. violated his terms of deferred disposition by (1) using or possessing non-prescribed drugs or alcohol; and (2) failing to reside in housing approved by his/her parent or guardian or in placement authorized by Department of Social and Health Services or the court and/or to inform the probation counselor of a change of address or placement.

The court looked at the cases' history in the court's electronic docket system, inaccurately discussed C.J.C.'s past actions of violating EHM, and also discussed generally the various attempted interventions. But as to determining whether the State met its burden in presenting evidence that proved by a preponderance that C.J.C. violated his terms of deferred disposition as alleged at the February 15 hearing, the court simply said, "He pled guilty and left placement. He violated in February of this

year." This says nothing about what evidence the court relied upon and whether the State met its burden by a preponderance based on that evidence.

Even assuming, without deciding that the trial court adequately explained its reasons for revocation, the court failed to indicate the evidence it relied upon. "In the absence of written findings, the lower court's failure to create an oral record sufficient for review resulted in a violation of defendant's due process rights." Murray, 28 Wn. App. at 901.

CONCLUSION

Ordinarily, we would remand to the trial court for entry of written findings which comply with the minimum requirements of due process. However, the trial judge who presided at the revocation hearing has since retired. Accordingly, we reverse, remand, and direct the court to conduct a new revocation hearing. See Murray, 28. Wn. App. at 902.

_____
Coburn, J.

WE CONCUR:

_____
Díaz, J.

_____
Smith, J.